J-S40033-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: RELINQUISHMENT OF: T.T.C.M., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.R., MOTHER | : : : : : : : | |
| | : | No. 1150 MDA 2025 |

Appeal from the Order Entered July 15, 2025
In the Court of Common Pleas of Lackawanna County Orphans' Court at
No(s): A-35 of 2025

BEFORE: LAZARUS, P.J., PANELLA, P.J.E., and MURRAY, J.

MEMORANDUM BY MURRAY, J.:            **FILED: DECEMBER 17, 2025**

J.R. (Mother) appeals from the order granting the petition filed by the Lackawanna County Office of Youth and Family Services (hereinafter Agency) and terminating her parental rights to T.T.C.M. (Child), a daughter born in January 2023.[1]  After careful review, we affirm.

The orphans' court provided the following history underlying this appeal:

> [The Agency] was already involved [with Child's family] at the time of [Child's] birth[,] because the Agency had an open dependency case involving [Child's] three half-siblings.[FN1] [Child] tested positive for Gabapentin, Suboxone, and marijuana at birth.  An Emergency Protective Order was obtained on January 13, 2023.  The Shelter Care order was entered on January 17, 2023.  [Child] spent one month in the hospital because she was treated for withdrawal symptoms.

---

[1] Child's biological father (Father) is not a party to this appeal.

[FN1] Mother's parental rights to [Child's] three half-siblings were terminated by the Honorable Andrew J. Jarbola on May 31, 2024.

[Child] was adjudicated dependent on February 13, 2023. [Child] was released from Moses Taylor Hospital on February 9, 2023, and placed with her current foster parents on that same date. Agency Exhibit 3. The Agency filed a Petition to Terminate Parental Rights on May 21, 2025. A hearing on the petition was held on June 2, 3, 18, and 26, 2025.

## 1. **Agency Supervision**

Initially, [Child's] dependency case was supervised by Agency caseworkers. Agency Exhibit 3 Case [N]otes. Sharon Roginski [(Ms. Roginski)], a supervisor with the Agency, was the caseworker from April 18, 2023, to October 9, 2023. Service Access Management (hereinafter SAM) assumed responsibility for supervising this dependency action on October 9, 2023. Initially, [SAM] caseworker Jamie Roland [(Ms. Roland)] was [] assigned to this family. In October 2024, Cory Ruda [(Mr. Ruda)] took over for [Ms.] Roland. Mr. Ruda remains the caseworker to this day. [Child's] case was on a separate procedural track from her three half-siblings.[FN2]

[FN2] The three half-siblings were adjudicated dependent on April 29, 2021.

## 2. **Family Service Plans**

During the pendency of [the] dependency action, four family service plans (hereinafter FSP) were written. The first [FSP] was created on January 1, 2023, eleven (11) days before [Child's] birth. (N.T. [(afternoon session)], 6/3/2025[, at] 17). This plan was written for the dependency action for [Child's] three maternal half-siblings. *Id.* This FSP was adopted in this action at the initial permanency review hearing on April 27, 2023. *Id.* at 16. The second FSP was written on July 1, 2023, and adopted on August 29, 2023. *Id.* at 17. The third FSP was written on January 1, 2024, and adopted on April 3, 2024. *Id.* The fourth FSP was written on January 13, 2025, but not adopted. *Id.* at 18.

All the FSPs had the same goals and objectives. *Id.* at 19. Both Mother and Father [(collectively, parents)][2] were to maintain a sober lifestyle, maintain a safe and stable home, understand[] their role as [] nurturing caregiver[s], address their mental health, ensure the emotional and physical well-being of [Child], and understand how their actions impact [Child]. *Id.* at 20. In addition, Father was to attend Domestic Violence Intervention Classes. *See* [Agency] Exhibit 4. Throughout the [history] of this action, both parents were rated for their compliance and progress on the FSPs. *Id.* at 24….

Orphans' Court Opinion, 10/2/25, at 1-3 (footnotes in original maintained; one footnote added; punctuation modified).

In its opinion, the orphans' court detailed the evidence presented at the termination hearing:

[Ms.] Roginski testified the Agency took custody of [Child] at the hospital[, following her birth]. (N.T. [(afternoon session),] 6/3/2025[, at] 12). She said [Child] was born with Gabapentin, Suboxone, and marijuana in her system. *Id.* at 13. She testified the Agency was familiar with the family because of the open dependency action involving [Child's] three older half-siblings. *Id.*

The Agency was concerned about domestic violence and [Mother's] drug use. *Id.* at 14. Ms. Roginski testified [Child] has been in care longer than provided for in the Adoption and Safe Families Act (ASFA)[, 42 U.S.C.A. § 675,] guidelines. *Id.* at 31. She said the Agency must have a compelling reason to justify allowing the family to have more time [to forestall termination]. *Id.* at 32. She testified the parents' lack of progress on the FSP is a concern. *Id.* She testified the Agency granted the family additional time because of the transition between the agencies. *Id.* She said the Agency wanted to make sure the family was not penalized by the change in supervising agency. *Id.* Ms. Roginski was the supervisor of the case from April 2023 to October 2023. *Id.* at 36. Ms. Roginski testified the Agency made the decision to

_____

[2] The Agency also sought termination of Father's parental rights to Child. The termination petitions were litigated together before the orphans' court.

proceed with the termination of parental rights petition because [Child] had been in placement for twenty-eight (28) months at the time the petition was filed, and the parents had not progressed to unsupervised visitation. *Id.* at 42. They had not progressed in other areas of the FSP as well. *Id.* at 42, 50-51.

Ms. Roginski testified the Agency has concerns about [Child's] safety because of domestic violence in [parents'] home. *Id.* at 53-55. The Agency is concerned Mother is not able to provide for her own safety, let alone the safety of [Child]. *Id.* at 54.

Orphans' Court Opinion, 10/2/25, at 4-5.

Ms. Roginski also testified regarding Child's visits with parents. According to Ms. Roginski, parents were offered visits with Child, at the Agency, three times per week. N.T. (afternoon session), 6/3/25, at 43. During the visits, caseworkers stopped in periodically, but were not present throughout the visits. *Id.* Further, Ms. Roginski testified that the staff felt intimidated by Father during visits. *Id.* at 144. As a result, the visits were moved to the Outreach Center for Community Resources (Outreach), and reduced to one, two-hour visit per week. *Id.* A second visit was added for one hour every Thursday. *Id.*

Kristy Vassell (Ms. Vassell), a visitation worker at Outreach, testified at the termination hearing. According to Ms. Vassell, she oversees a staff of ten people and supervises visits. N.T. (first afternoon session), 6/2/25, at 33. Ms. Vassell testified that she is required to complete 26 hours of training per year, and has been employed in this field for 12 years. *Id.* Ms. Vassell

explained that she facilitated the visits between Child and parents. *Id.* The

orphans' court provided the following summary of Ms. Vassell's testimony:

> Ms. Vassell testified the visits with parents have had a lot of issues. *Id.* at 34. She identified the issues as "being engaged with [Child], the smell of marijuana, disrespect to the staff, arriving on time, sleeping during the visit, on the phones." *Id.* She testified there has been some improvement.
>
> ….
>
> Ms. Vassell testified about an incident that occurred at the April 3, 2025, visit. *Id.* at 40. She testified Father stepped out of the room. *Id.* Mother appeared to be intoxicated. *Id.* Mother was swaying and her eyes were closed. *Id.* Ms. Vassell testified Mother leaned over her chair and Ms. Vassell was concerned Mother was going to fall out of the chair. *Id.* [Child] was under the table in the room at this point. *Id.* at 40-41. When Ms. Vassell entered the room, [Child] ran over to Ms. Vassell and Ms. Vassell picked [Mother] up. *Id.* at 41. She testified it took Mother a minute [to] realize Ms. Vassell was in the room. *Id.* Mother's eyes were half opened, and her speech was slow and slurred. *Id.* at 41. Mother said she had a headache. *Id.* Father reentered the room and proceeded to ask Mother about what happened. *Id.* He wanted to know why Ms. Vassell was in the room. *Id.* He told Mother she better not "mess it up for him." *Id.* Ms. Vassell described Mother's position when she was in the chair in more detail, saying [Mother] had her chest on her knees. *Id.* at 44. Mother also sat up and reached for a cellphone that was not there. *Id.* at 45. She was typing or texting on a phone that did not exist. *Id.* []
>
> Next, Ms. Vassell was asked to describe a change in [Child's] behavior [during visits]. *Id.* at 46. In recent weeks, [Child] has started "pooping in her diaper." *Id.* at 46. Ms. Vassell said Mother is appropriate and changes [Child's] diaper immediately. Ms. Vassell also described Mother as falling asleep during a visit on February 2, 2025. *Id.* at 48.
>
> Ms. Vassell testified about another incident that occurred on May 13, 2025. *Id.* at 53. Stephanie Herne [(Ms. Herne)] supervised this [evening] visit. *Id.* Mother asked to speak to Ms. Herne. *Id.* Mother said she and Father broke up. *Id.* Mother asked Ms.

Herne to tell Father to stop calling other women. *Id.* The visit supervisor asked Father to get off the phone. *Id.* Mother told Ms. Herne that Father said he is going to take [Child] to New York to be with his "ex." *Id.* Mother was emotional and had a hard time controlling [] her emotions. *Id.* at 54.

Orphans' Court Opinion, 10/2/25, at 6-7. Significantly,

Ms. Vassell testified[,] in her opinion[,] a safety concern exists. (N.T. [(first afternoon session)], 6/2/2025[,] … [at] 51-52). She testified to the following:

Q. [The Agency:] Basically, when we talk about what you testified about the concerns you observed of [M]other, looking as if she had intoxication of some sort, does that raise any concerns for you in the job that you do at Outreach?

A. [Ms. Vassell:] It does as to if this is something that's occurring while [Child] is in their care, and the parent is presenting as intoxicated or high, where is [Child] during this time frame if they do become incoherent or anything like that. It's also concerning because this is a controlled environment on our end, and so we're still seeing some of these behaviors[,] even though we've had some really good visits and good weeks of visits that these behaviors are still persistent.

….

[*Id.*]

Orphans' Court Opinion, 10/2/25, at 8 (punctuation modified).[3]

---

[3] After the November 25, 2024, review hearing, Ms. Roginski and Ms. Vassell discussed allowing Child to have unsupervised visits with parents. N.T. (first afternoon session), 6/2/25, at 67. However, Ms. Roginski and Ms. Vassell determined parents were not ready for unsupervised visits with Child. *Id.*

Mr. Ruda, who became Mother's caseworker in October 2024, also testified. Mr. Ruda testified that Mother has had minimal progress ratings under the most recent FSPs. N.T. (morning session), 6/3/25, at 4. Mother was required to submit to drug screenings three times per week until January 13, 2025, when the orphans' court granted the Agency's motion for aggravated circumstances. *Id.* Mother provided no documentation to Mr. Ruda regarding screenings performed by other groups or agencies. *Id.* at 6.

As summarized by the orphans' court,

Mr. Ruda testified on November 25, 2024, he observed a visit with parents and [Child] at Outreach. [N.T., 11/25/24,] at 31-33. He testified … [that] Mother [was] "being extremely lethargic, not having her senses together, being extremely tired, and I had witnessed her kind of shamble across the room and stand in the corner." *Id.* … [Mr. Ruda] testified he also observed a heavy smell of cannabis in the room throughout the case. *Id.* at 32-33. At one point, Mr. Ruda asked Mother to get [a drug screening] for the Agency immediately after a visit because she "appeared extremely under the influence." *Id.* at 31. That request precipitated an argument. *Id.* at 31. The parents responded to the request saying "why are we being targeted? I don't feel comfortable. It is time for another caseworker." *Id.*

Mr. Ruda testified … the parents would get into arguments during the visits. *Id.*

The Agency asked Mr. Ruda to testify about the domestic violence issue. *Id.* at 35. He testified[,] in his own personal experience, that he spoke to Mother on the telephone while Father was in the background. *Id.* at 39. Mother and Father blew off the seriousness of the situation by stating, "we are husband and wife, fights happen," and "why are people calling the cops?" *Id.* at 39. In Mr. Ruda's opinion, Mother and Father lacked the ability to recognize what is really happening. *Id.* at 39-41. Mother and Father blamed everything on other people. *Id.* at 40. … Mr. Ruda testified the fighting between the parents has had a negative

> impact on [Child.] *Id.* at 44. After one visit ended, [Child] said[,] "Daddy mad, Daddy mad." *Id.*
>
> Mr. Ruda testified[,] based on his knowledge of the case[,] it would not be safe to return custody of [Child] to Mother …. *Id.* at 45….

Orphans' Court Opinion, 10/2/25, at 9-11.

Kristin Baer (Ms. Baer), the director of LOTUS Therapeutic and Empowerment Services, served as the family's domestic violence and anger management educator. N.T. (morning session), 6/2/25, at 57-58. Ms. Baer described an incident that took place on May 27, 2025. *Id.* at 79. On that date, Mother texted Ms. Baer and reported that Father called Mother names and is "kicking her out of the house." *Id.* Mother retracted this statement five days later. *Id.* at 81.[4]

George Hockenbury (Mr. Hockenbury), an employee at Northern Tier Research, testified as an expert toxicology witness. N.T. (afternoon session), 6/2/25, at 3-5. Mr. Hockenbury testified that Mother's drug screens all tested positive for THC, consistent with her declared medical marijuana use. *Id.* at 9. Mother also tested positive for Klonopin and Subutex, for which she had prescriptions. *Id.* at 10.

> The Agency asked Mr. Hockenbury to testify about the number of screens that had a positive THC reading greater than 500 nanograms per milliliter. *Id.* … Mr. Hockenbury testified 500 nanograms is the highest calibrator for the "quantification of

---

[4] At the time of the termination hearing, Ms. Baer testified, Mother was approximately five months pregnant. *Id.* at 86.

cannabinoids." *Id.* at 10-11. He testified they are unable to record the value on any screen that is greater than 500. *Id.* at 11. A reading of 500 nanograms per milliliter or greater in the urine is a "significant amount of cannabinoids." *Id.* at 12. Mr. Hockenbury opined he would expect an amount of 500 nanograms per milliliter in a person's system to influence the individual's coordination, reaction times, and memory cognition. *Id.* at 12. In addition, it can cause anxiety and panic. *Id.*

Mr. Hockenbury testified Mother had five positive screens. *Id.* at 13. He listed the substances found and the dates of the tests. *Id.* at 14. Mr. Hockenbury testified Mother had thirty-four screens that contained greater than 500 nanograms of THC per milliliter. *Id.* at 10. *See also* [Agency] Exhibit 8.

….

Mr. Hockenbury testified different toxicology agencies have different parameters for accepted levels of the THC nanograms per milliliter. *Id.* at 21-22. Mr. Hockenbury testified the symptoms of impairment may be present with lower levels of THC. *Id.* He gave the example of three hundred nanograms per milliliter. *Id.* at 23. Mr. Hockenbury testified a dispensary is required to limit the quantity of medical marijuana an individual can purchase. *Id.* at 27. He testified he is not able to determine if the individual is buying marijuana from a dispensary or off the street. *Id.* He said a caseworker should be able to verify by asking the individual to produce receipts from the dispensary. *Id.* at 27-28.

Orphans' Court Opinion, 10/2/25, at 12-14.

The orphans' court additionally heard testimony regarding the protection from abuse (PFA) petitions filed against one another by Mother and Father. N.T. (morning session), 6/3/25, at 33. Of note, Mother filed a PFA petition on June 12, 2024, alleging an incident of abuse took place one day prior. Agency Exhibit 21, ¶ 11. Mother averred ongoing instances of physical, mental, and emotional abuse. *Id.* ¶ 12. According to Mother, Father

threatened to strike her with a broomstick, and had smashed her phone. *Id.*

¶ 13(a). Thereafter, Mother stated, her PFA petition was granted and the

Women's Resource Center placed her in a safehouse. *Id.* Father's respective

PFA petition, filed at the same time, was denied. Agency Exhibit 22.

The Agency also presented evidence of 911 call reports involving

parents. N.T., 6/2/25, at 22. Two calls were placed on February 20, 2024:

The first occurred at 1:54 a.m.; the second occurred at 2:37 a.m. *Id.* at 34.

The Agency further introduced a third call dated May 14, 2025, at 2:41 p.m.

*Id.* at 35.

The orphans' court described the testimony of Scranton Police Officer

Anthony Gallucci (Officer Gallucci):

> [Officer Gallucci] authenticated his police report[,] which was
> admitted as [Agency] Exhibit 6. [N.T. (morning session), 6/2/25,
> at 39.] He responded to parents['] address on February 20, 2025.
> *Id.* at 42. He responded to the first 911 call, which was a welfare
> check request made by a third party. *Id.* at 42-43. Officer
> Gallucci testified Mother told the police upon their arrival, "that a
> man inside the apartment was trying to get in the bathtub with an
> 11-year-old girl." *Id.* at 43. Mother was crying hysterically. *Id.*
> at 52. Mother further stated she was locked in a room. *Id.* The
> officers went around back and were greeted by Father and his 11-
> year-old daughter. *Id.* at 43-44. The 11-year-old daughter
> denied Mother's allegation to the police. *Id.* at 47. The officers
> were able to discern Mother and Father had an ongoing verbal
> altercation. *Id.* at 46. No charges were filed. *Id.* at 50. The
> officers responded again to the parents' address later that
> morning in response to the second 911 call. *Id.* at 50-51.
> According to Officer Gallucci, it appeared the argument was
> cooling down, as Father left the residence to take a walk. *Id.* at
> 51. Again, no charges were filed.

Orphans' Court Opinion, 10/2/25, at 16-17.

- 10 -

In addition,

The Agency called Christina Perry [(Ms. Perry)] as a witness. (N.T. [(morning session),] 6/18/2025[, at] 5). She is employed at Turning Point Alternative Living Solutions (hereinafter TPALS). *Id.* Ms. Perry had been Mother's drug and alcohol counselor. *Id.* at 5. Ms. Perry authored a letter discharging Mother unsuccessfully from treatment. *Id.* at 8. The letter was introduced as [Agency] Exhibit 23. *Id.* at 6. Ms. Perry testified Mother first engaged with TPALS in 2022. *Id.* at 7. Mother was compliant initially. *Id.* Then she became noncompliant. *Id.* She was missing both group and individual sessions. *Id.* Ms. Perry testified she gave Mother multiple opportunities to be compliant. *Id.* at 8. Mother did not comply. *Id.* Mother was unsuccessfully discharged [from TPALS] on March 26, 2025. *Id.* Ms. Perry observed Mother had a lack of external motivaton. *Id.* at 12. Ms. Perry attributed Mother's lack of motivation and progress to Mother's depression. *Id.* Ms. Perry referred Mother to Scranton Counseling Center for depression. *Id.* at 13. Mother told Ms. Perry she was not going to attend counseling. *Id.* at 14.

Orphans' Court Opinion, 10/2/25, at 17-18.

Foster mother also testified at the hearing:

The Agency called [Mrs. M.], foster mother, as a witness. N.T. [(second afternoon session),] 6/2/2025[, at] 15. [Mrs. M.] testified [Child] was placed with her on February 9, 2023, when [Child] was discharged from the N.I.C.U. *Id.* at 16. She testified [Child] struggled with developmental delays and they (foster parents) enrolled her in many services. *Id.* Mrs. [M.] testified [that] initially[,] the [foster] parents were prohibited from contacting biological parents after Mother made threats when [Child] was placed with [Mrs. M's family]. *Id.* at 17. Mrs. [M.] testified she and her husband tried their best to support the parents' reunification efforts. *Id.* at 18. She testified about how the visits have been scheduled. *Id.* at 22. Mrs. [M.] also testified about behavioral changes she has noticed in [Child] at the visits. *Id.* at 23. She said in the beginning of February 2025, [Child] started "pooping" in her diaper, while hiding under a chair at the visitation center. *Id.* at 24. She said [Child] does not engage in this behavior in her home. *Id.* She also testified [Child] has started crying, clinging to foster mother, unbuckling her car seat while foster mother is driving and screaming "Mamma, Mamma,

Mamma" after visits. *Id.* at 24. She testified she had to buy a new car seat because [Child] was able to unbuckle the old one. *Id.* At night, [Child] clings to foster mother[,] refusing to go in her crib. *Id.* at 25. … Mrs. [M.] testified about a prior court order prohibiting Mother from calling Mrs. [M.] because Mother would call in the middle of the night while arguing with Father. *Id.* at 32. She said she told [Child's] guardian *ad litem* when Mother would call at night. *Id.* at 33. After that, Mother called foster mother and said "not nice" things. *Id.* at 33. The calls were stopped. *Id.*

Orphans' Court Opinion, 10/2/25, at 18-19 (punctuation modified).

Mother testified at the hearing. According to the orphans' court,

[Mother] testified [Child] went into foster care directly from the hospital. [N.T., 6/18/25,] at 18. She said [Child] has never been in her care. *Id.* She testified [Child] is the only child she shares with Father; however, she is currently pregnant with their second child. *Id.* [Mother] is employed as a caregiver for her sister. *Id.* at 19. [Mother testified she] is employed full-time and [works] eight hours a week in overtime. *Id.* Mother testified visits started out at the Agency and occurred three times a week for two hours each. *Id.* at 20. When [Child] was about nine months old, the visits transferred to Outreach. *Id.* At Outreach[,] the visits are every Monday for two hours and every other Tuesday for one hour. She said the visits go smoothly. *Id.* She said she feeds [Child] and changes her diaper. *Id.* at 21. In addition, they play and engage in speech therapy. *Id.* Mother disputed Ms. Vassell's testimony about some of the incidents that occurred. *Id.* at 22. Mother denied being under the influence and said she was sick. *Id.* Mother testified she completed Safe Care, parenting classes, and TPALS two times, once in 2021 and 2022. *Id.* at 23-24. Mother testified she [submitted to toxicology screens] for the Agency, [and] TPALS…. *Id.* at 24-25. Mother testified she is prescribed Clonazepam for anxiety, Subutex and medical marijuana. *Id.* at 25. … Mother testified her "main concern" is her mental health. *Id.* at 29. She had an upcoming appointment at Scranton Counseling Center scheduled for June 23, 2025. *Id.* She testified she had been seeing two counselors at TPALS. *Id.* She testified she was noncompliant with TAPLS in March 2025 because of her pregnancy. *Id.* at 30. She said she did not have insurance to get treatment for depression. *Id.* at 30. But now, she has insurance and scheduled the appointment. *Id.* [Mother]

> testified her house is appropriate for [Child]. *Id.* at 31-32. Regarding [the] PFA [petition Mother filed against Father], [Mother] testified her caseworker[, Ms.] Roland[,] made her file the PFA and told her what to write. *Id.* at 33-34, 52. [Mother] denied Father ever assaulted her. *Id.* at 34.
>
> Mother testified she and [Child] share a bond. *Id.* at 39. [Child] clings to [Mother] and calls her mom. *Id.* at 39-40. She said [Child] calls Father "daddy." *Id.* at 39.

Orphans' Court Opinion, 10/2/25, at 20-21.

The Agency also presented the testimony of the guardian *ad litem*, George Mehalchick, Esquire (Attorney Mehalchick), who confirmed that Child's legal and best interests are aligned. N.T., 6/26/25, at 111. Attorney Mehalchick testified that termination of Mother's parental rights is in Child's best interests. *Id.*

The orphans' court additionally heard testimony regarding Child's bond with Mother and foster parents. The permanency case manager for the Agency, Matthew Rink (Mr. Rink), testified that Child is "very bonded with the foster family." N.T. (second afternoon session), 6/2/25, 51. According to Mr. Rink, the foster family has been addressing Child's medical and behavioral needs. *Id.* at 52, 54. Mr. Rink testified there have been four or five meetings between Child and parents, and that Child seemed comfortable with parents. *Id.* at 59. According to Mr. Rink, Mother and Father are playful and affectionate with Child. *Id.* at 60-61.

Ms. Vassell testified that Child's visits with parents are improving. N.T. (first afternoon session), 6/2/25, at 35.

Ms. Vassell observed [Child] is comfortable with both parents. [*Id.* at 39.] [Child] does go to Mother, who "is perceived to be the primary caregiver." *Id.* The parents show affection to [Child] *Id.* [Child] shows affection back to her parents. *Id.* at 39-40. She will hug and kiss them, blow kisses and wave "bye-bye." *Id.* at 40. She climbs on Father when he is on the floor. *Id.* Ms. Vassell testified [Child] appears to be very attached to and well bonded with foster mother. *Id.* at 60. She testified [Child] looks for foster mother at the end of the visit. *Id.* [Child] goes right to [foster mother] and wants to be picked up by her. [Child] appears to be extremely attached to foster mother. [Child] looks to foster mother for her care, comfort, and support. *Id.* at 61. Ms. Vassell also testified she believes [Child] is bonded with her parents as well. *Id.* The visits have improved. *Id.* She testified [that] at one point[, Child] referred to [parents] as mom and dad. *Id.* … [Child] expresses affection with them. *Id.*

Orphans' Court Opinion, 10/2/25, at 26-27.

In addition, the orphans' court summarized the testimony of Mr. Ruda regarding Child's bond with Mother and Child's foster parents:

He testified [Child] is "extremely well-bonded" with her foster family, particularly foster mom. [N.T. (morning session), 6/3/25, at 41.] He testified [Child] is very comfortable in her foster family. *Id.* at 4. He said [Child] is progressing in her development and is doing excellent. *Id.* at 42. He testified that he had the opportunity to observe [Child] and her parents. *Id.* at 43. He testified their relationship has improved. *Id.* … [Mr. Ruda] said [Child] is much more comfortable with Mother. *Id.* Mr. Ruda testified [Child] is very observant. *Id.* He said [Child] is aware when the visits go poorly because the parents are upset. *Id.* at 43. He said [Child] becomes upset when people around her are upset. *Id.* At the May 13, 2025, visit, [Child] said "daddy, mad" when the parents were fighting. *Id.* at 44.

Orphans' Court Opinion, 10/2/25, at 27-28.

Mother testified that Child clings to her and calls her "mommy." N.T. (afternoon session), 6/18/25, at 39.

Mrs. M. testified that Child is very attached to her. N.T. (second afternoon session), 6/2/25, at 21. Mrs. M. testified that her 10-year-old son and Child are "best friends." *Id.* at 38.

On July 15, 2025, the orphans' court granted the Agency's petition and terminated Mother's parental rights to Child pursuant to Section 2511(a)(8) and (b), 23 Pa.C.S.A. § 2511(a)(8), (b). Orphans' Court Order, 7/15/25. Thereafter, Mother timely filed a notice of appeal and a contemporaneous Pa.R.A.P. 1925(b) concise statement of matters complained of on appeal. The orphans' court has filed an opinion.

Mother presents the following issues for our review:

A. Whether the [orphans'] court erred as a matter of law and/or manifestly abused its discretion in finding that the [Agency] had proven the grounds for termination of parental rights by clear and convincing evidence pursuant to 23 Pa.C.S.A. § 2511(a)(8), when Mother addressed and/or was continuing to address the circumstances that originally necessitated placement, and those conditions no longer existed?

B. Whether the [orphans'] court erred as a matter of law and/or manifestly abused its discretion in determining the [Agency] sustained its additional burden of proving the termination of Mother's parental rights is in the best interests of [] Child, when there was consistent testimony and evidence of the bond between Mother and Child?

Mother's Brief at 5 (punctuation modified).

We review the termination of parental rights for an abuse of discretion. *In the Int. of K.T.*, 296 A.3d 1085, 1104 (Pa. 2023). This standard of review requires appellate courts to

accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As the Pennsylvania Supreme Court discussed in *In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010), there are clear reasons for applying an abuse of discretion standard of review…. Unlike trial courts, appellate courts are not equipped to make fact-specific determinations on a cold record, where trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*Interest of K.T.*, 324 A.3d 49, 56 (Pa. Super. 2024) (brackets omitted)

(quoting *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012)).

Termination of parental rights is governed by Section 2511 of the

Adoption Act, which requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [Section] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [Section] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between

- 16 -

parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Matter of Adoption of L.C.J.W.*, 311 A.3d 41, 48 (Pa. Super. 2024) (citation omitted).

The standard of "clear and convincing" evidence is defined as "evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Int. of R.H.B.*, 327 A.3d 1251, 1256 (Pa. Super. 2024) (quotation marks and citation omitted). Finally, this Court need only agree with the trial court as to "any one subsection of [Section] 2511(a), in addition to [Section] 2511(b), in order to affirm the termination of parental rights." *Int. of M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022) (citation omitted).

Instantly, we examine the termination of Mother's parental rights pursuant to Section 2511(a)(8) and (b), which provide as follows:

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

**(8)** The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * *

- 17 -

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b) (bold in original).

Thus, pursuant to Subsection 2511(a)(8), the petitioner must prove (1) the child has been removed from parental care for 12 months or more; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) the termination of parental rights would best serve the needs and welfare of the child. ***See id.*** § 2511(a)(8).

Unlike other subsections, § 2511(a)(8) does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the child[.] ***In re M.A.B.***, 166 A.3d 434, 446 (Pa. Super. 2017). "[T]he relevant inquiry" regarding the second prong of § 2511(a)(8) "is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." ***In re I.J.***, 972 A.2d 5, 11 (Pa. Super. 2009). Further, the Adoption Act prohibits the court from considering, as part of the § 2511(a)(8) analysis, "any efforts by the parent to remedy the conditions described [in the petition] which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S.A. § 2511(b).

Although § 2511(a) generally focuses on the behavior of the parent, the third prong of § 2511(a)(8) specifically "accounts for the needs of the child." ***In re C.L.G.***, 956 A.2d 999, 1008-09 (Pa. Super. 2008) (*en banc*). This Court has recognized "that the application of [§ 2511(a)(8)] may seem harsh when the parent has begun to make progress toward resolving the problems that

- 18 -

had led to the removal of his or her child[.]" *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

> **However, by allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities.** The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. **Indeed, we work under statutory and case law that contemplates only a short period of time** … **in which to complete the process of either reunification or adoption for a child who has been placed in foster care.**

> *Id.*

*In re M.E.*, 283 A.3d 820, 832 (Pa. Super. 2022) (emphasis added).

Mother first argues the Agency failed to sustain its burden for terminating Mother's parental rights under Section 2511(a)(8). Mother's Brief at 8. Mother asserts that pursuant to her FSP, she was

> required to maintain a sober life, follow drug and alcohol treatment recommendations, obtain safe and stable housing, maintain her mental health, and understand the healthy and mutually respected relationship. (N.T. [(mid-morning session),] 6/3/25, [at] 5-6).

*Id.* at 10. Mother claims that throughout the life of this case, she has remained sober and possesses a medical marijuana card. *Id.* Mother states that from January 13, 2023, to May 1, 2025, she was screened for the presence of drugs 21 times. *Id.* at 10-11. According to Mother, "[o]f the 21 drug screens, only six (6) were positive for a substance [Mother] was not prescribed. Notably, the last positive screen for [Mother] was on May 3,

- 19 -

2024[,]" which was more than one year prior to the termination proceedings. *Id.* at 11.

Mother also claims that she has maintained safe and stable housing in an appropriate home; she engaged in mental health services; and she has maintained full-time employment. *Id.* Mother points out that she was not required to participate in a domestic violence program. *Id.* at 12. According to Mother, she complied with all FSP requirements and has remedied the conditions that led to Child's placement. *Id.*

> The Agency counters that
>
> the conditions which led to [Child's] original placement continue to exist. There continue[] to be concerns regarding Mother's usage of controlled substances, with even her medical marijuana usage being problematic[,] due to extremely elevated levels and evidence of her falling asleep during visitation and being seemingly incoherent. Similarly, the on-and-off discourse, resulting in safety concerns and police contact, between Mother and Father[,] persisted.

Appellee's Brief at 15 (punctuation modified). The Agency acknowledges Mother's efforts to overcome the circumstances necessitating Child's placement, but argues that

> Mother's efforts, and even her "moderate progress[,]" are not a bar to [a] finding that after a requisite period of time[,] the conditions necessitating placement still existed and were not likely to be remedied within a reasonable time….

*Id.* The Agency points out that Child was adjudicated dependent in January 2023, due to concerns about Mother's drug usage and her volatile relationship with Father. *Id.* at 16. According to the Agency, "Mother has never

demonstrated an ability to appropriately parent [Child] on a full-time basis or put [Child's] needs above her own." *Id.* The Agency further asserts that

> Mother's minimalization of multiple positive drug screens, [the] alarmingly high levels of marijuana in her system, and the consistently tumultuous relationship between [Mother] and Father does not rise to the level of the [orphans'] court's abuse of discretion, and the [orphans'] court's decision should be affirmed.

*Id.*

The orphans' court found that the Agency had established grounds for termination pursuant to Section 2511(a)(8):

> Initially, [Child] was removed from Mother and Father's custody due to ongoing concerns of domestic violence and drug use. [Child] was placed in the Agency's custody by way of an EPO (emergency protective order) on January 13, 2023, twenty-eight months prior to the start of the termination hearing. [The orphans' court is] satisfied the Agency established, by clear and convincing evidence, that the conditions which led to removal of the [C]hild still exist today. During the pendency of this case, parents have not attained a progress rating above moderate. The testimony revealed domestic violence is still an issue, as well as drug use. Due to the continuing presence of these two safety concerns, parents never progressed beyond supervised visits.
>
> Mother [has] made progress; however, the issues [that necessitated Child's placement] continue to persist. Incidents were reported during the pendency of the termination proceedings. The Agency introduced a recording of Mother nodding off during a visit in June 2025. As recently as May 2025, Mother reported domestic violence concerns to [Ms.] Baer, Father's domestic violence educator.
>
> This court is cognizant of the Agency's burden to establish a nexus between [Mother's] marijuana usage and [her] respective incapacity to care for [Child]. … **This court finds the testimony and evidence establishes the nexus**….
>
> ….

… Mother [] struggles in the visits, appearing on occasion to be intoxicated or incoherent, and nodding off.

Orphans' Court Opinion, 10/2/25, at 29-31 (punctuation modified; citation omitted).

The orphans' court further recognized that it

had the difficult task of deciding how best to address the "developmental, physical, emotional needs and welfare" of [Child]. [The orphans' court] finds that while it is impossible to interpret [Child's] behavioral changes in terms of why she is behaving in a certain way, [] it is clear that the lack of permanency is having a negative impact on [Child]. [The court] is satisfied [Child] will not suffer harm if the bond she shares with Mother … is terminated.

*Id.* at 31-32.

Upon review, we agree with the orphans' court that the Agency established, by clear and convincing evidence, that Child has been removed from Mother's care for twelve months or more, and the conditions which led to the removal or placement of Child continue to exist. The orphans' court's findings are supported in the record, and we discern no abuse of its discretion in concluding that the Agency met its burden of establishing grounds for termination, by clear and convincing evidence, pursuant to Section 2511(a)(8). Mother's first issue merits no relief.

In her second issue, Mother argues that the orphans' court abused its discretion in determining that the Agency established that termination of Mother's parental rights serves Child's best interests. Mother's Brief at 13. Mother claims the evidence established that Mother and Child are very

bonded. *Id.* at 14. Mother directs our attention to evidence regarding Child's interactions with Mother during visits:

> The record is devoid of any evidence that Mother and Child are not bonded. To the contrary, the visitation supervisor testified that Child is bonded and comfortable with Mother. [] Child would look to Mother and go to Mother in the visits. Mother was repeatedly described as the primary caregiver of Child during visits. [] Child calls Mother "mom." During the visits, Mother ensured [] Child was fed. Mother changed Child's diapers. Mother soothed Child during visits. Mother played with [] Child, hugged and kissed [] Child, and showed Child love.

*Id.* at 14-15 (capitalization modified). Mother also directs our attention to the testimony of Mr. Ruda, who observed these interactions, and stated the bond between Mother and Child is strong. *Id.* at 15.

Bond, permanency, stability, and all other intangibles are "all of 'primary' importance in the Subsection 2511(b) analysis." ***In the Interest of K.T., supra***, 296 A.3d at 1109. It is within the province of the orphans' court to "consider the totality of the circumstances when performing a needs and welfare analysis." *Id.* We will not disturb such an assessment if the court's factual findings are supported by the record. ***See id.***

Instantly, the orphans' court stated,

[Child] is [in] the only home she has ever known. All bond witnesses testified [Child] clings to her foster [m]other and is very bonded to her foster family. She needs physical affection and soothing after visits. She looks for her foster mother/father and brother when they leave the room.

The testimony also established Mother … share[s] an "emerging bond" with [Child]. [Child] is comfortable and affectionate with [Mother]. The testimony established this is an improvement over past visits.

....

> ... [The] orphans' court is satisfied [Child] will not suffer harm if the bond she shares with Mother ... is terminated.
>
> In light of all of the testimony presented[, the court] is satisfied the Agency has established by clear and convincing evidence the best interest of [Child] would be best served by terminating the parental rights of [] Mother .... Further, [the] court finds [Child] is well bonded with her foster family, as it is the only home she has ever known.[5]

Orphans' Court Opinion, 10/2/25, at 31-32 (footnote added).

Our careful review of the record confirms that the orphans' court's findings are supported in the record, and we discern no error or abuse of its discretion in concluding that the Agency established, by clear and convincing evidence, grounds for termination pursuant to Section 2511(b). Mother's second issue merits no relief. Accordingly, we affirm the order of the orphans' court, which terminated Mother's parental rights to Child.

---

[5] **See also In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013) ("[T]he mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition.")

Order affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>12/17/2025</u>